**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
(MIDLAND/ODESSA DIVISION)**

| | | |
|---|---|---|
| THOMAS B. BENNETT, TRUSTEE FOR THE MTE LITIGATION TRUST | ) ) ) ) | |
| Plaintiff, | ) ) | Cause No. __21-214__ |
| v. | ) ) | Jury Demanded |
| MARK SIFFIN, ROBERT QUINN, PAUL CYPHERS, MDC ACQUISITION LLC, MAEFIELD DEVELOPMENT CORPORATION and MDCE INVESTMENTS LLC | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>COMPLAINT</u>

Thomas B. Bennett, Trustee for the MTE Litigation Trust ("MTE Litigation Trust" or "Mr. Bennett")" alleges, based upon knowledge, information, and belief, as follows:

### I.  NATURE OF THE ACTION

1.      This case involves the spectacular failure of an oil and gas enterprise in the Permian Basin of West Texas created and run by a New York real estate developer, Defendant, Mark Siffin ("Mr. Siffin").  This failure culminated in bankruptcy proceedings that resulted in the creation of the MTE Litigation Trust.

2.      This is an action for fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, corporate waste and unjust enrichment.  The acts complained of herein were committed by Mr. Siffin and Defendants, Robert "Bob" Quinn ("Mr. Quinn"), Paul Cyphers ("Mr. Cyphers"), MDC Acquisition LLC ("MDC Acquisition"), Maefield Development Corporation ("Maefield") and MDCE Investments LLC ("MDCE").  MDC Acquisition, Maefield and MDCE are

1

entities that Mr. Siffin controls and owns (either directly or indirectly).   MTE Holdings LLC ("MTE"), an entity controlled by Mr. Siffin and in which he had an indirect ownership interest, borrowed in excess of $410 million from various Lenders[1] pursuant to a Term Loan Credit Agreement dated September 17, 2018 (the "Credit Agreement").   In order to make draws against the Credit Agreement, MTE was required to make certain financial disclosures to the Lenders stating that MTE was in compliance with the financial covenants contained in the Credit Agreement and that its subsidiary MDC Energy LLC ("MDC") was not in default under a different credit agreement described in further detail below. The financial covenants were a material part of the Credit Agreement, and the Lenders would not have entered into the Credit Agreement or advanced funds under the Credit Agreement without these financial covenants present and compliance therewith. Moreover, these financial covenants are typical covenants that lenders use and rely upon in commercial transactions.

3.     Nevertheless, various draws were made against the Credit Agreement based on fraudulent misrepresentations by Mr. Siffin, or at his direction, and/or by Mr. Quinn and Mr. Cyphers relating to the required financial covenants.  These representations were material and intentional, or at the very least were made recklessly as positive assertions without any knowledge of the truth of those representations.   Moreover, the Lenders actually and justifiably relied on the required representations Mr. Siffin,  Mr. Quinn and Mr. Cyphers made and never would have loaned money to MTE if they had known that Mr. Siffin,  Mr. Quinn and Mr. Cyphers had supplied them with

---

[1] The Lenders are: CPPIB Credit Investments III Inc.; Centaurus Capital LP; New Jutland Partners, LP; Fenwood Road Capital Partners, LP; AG Energy Funding, LLC; Riverstone Credit Partners – Direct, L.P.; Riverstone Credit Partners II – Direct, L.P.; Riverstone Strategic Credit Partners A-1 AIV, L.P.; Melody Business Finance, LLC; The Värde Fund XII (Master), L.P.; Värde Investment Partners (Offshore) Master, L.P.; Värde Investment Partners, L.P.; The Värde Fund VI-A, L.P.; The Värde Skyway Master Fund, L.P.; and  The Värde Private Debt Opportunities Fund (Onshore), L.P. (collectively the "Lenders").

materially false financial information.  This suit thus seeks to recover from Mr. Siffin,  Mr. Quinn and Mr. Cyphers the funds loaned to MTE based on these misrepresentations.

4.     Besides lying about the MTE's and MDC's financial condition, Mr. Siffin with the assistance of Mr. Quinn, Mr. Cyphers, Maefield and MDC Acquisition also stole $8.5 million through phantom consulting agreements that had no legitimate business purpose.  The transfer of this $8.5 million that was orchestrated by Mr. Siffin, and assisted by Mr. Quinn, Mr. Cyphers, MDC Acquisitions and Maefield, occurred while MTE was in default under the Credit Agreement. Furthermore, once those funds were stolen the funds were then transferred directly to, or for the benefit of, Mr. Siffin, Maefield and MDCE.  This suit thus seeks to recover from Mr. Siffin, his entities, and Mr. Quinn and Mr. Cyphers, the funds stolen by Mr. Siffin and later transferred at the direction of Mr. Siffin.

## II.  THE PARTIES

5.     Plaintiff, The MTE Litigation Trust, was established on September 17, 2021, pursuant to a confirmed bankruptcy plan as described below. As set forth below, the MTE Litigation Trust was created to pursue claims on behalf of the MTE Litigation Trust Beneficiaries, who are certain pre-petition creditors of the MTE Debtors.

6.     On October 22, 2019, MTE filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code.  On October 23, 2019, MTE Partners LLC and Olam Energy Resources I LLC filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (MTE Holdings LLC, MTE Partners LLC and Olam Energy Resources I LLC are collectively referred to as the "MTE Debtors").  On November 8, 2019, MDC Energy LLC, MDC Reeves Energy LLC, MDC Texas Operator LLC and Ward I, LLC (together with the MTE Debtors, collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code. The Debtors' bankruptcy cases were pending in the U.S. Bankruptcy Court for the District of

3

Delaware, and the Debtors bankruptcy cases were jointly administered under *In re MTE Holdings LLC, et al.,* Case No. 19-12269 (CTG).

7.      On September 3, 2021, the Debtors filed the *Sixth Amended Joint Chapter 11 Plan of Reorganization for MTE Holdings LLC and Its Affiliated Debtors* [Docket No. 2588] (as may be amended, supplemented, or otherwise modified from time to time, the "Plan"), which was confirmed by the Bankruptcy Court on September 3, 2021, pursuant to the Findings of Fact and Order Confirming Plan of Reorganization for the Debtor [Docket No. 2590] (the "Confirmation Order"). The Plan was consummated and became effective on September 17, 2021, at which time all property of the bankruptcy estate was disposed of and the automatic stay terminated.

8.      Pursuant to the Plan and Confirmation Order, all rights, title, and interest in all of the MTE Litigation Trust Assets are hereby to be irrevocably transferred by the MTE Debtors to the MTE Litigation Trust (each as defined herein) created and evidenced by this Agreement so that (i) MTE Litigation Claims can be investigated, prosecuted, settled, abandoned, resolved, and otherwise monetized as may be determined by the MTE Litigation Trustee in accordance with the terms of this Agreement; (ii) recoveries on the Litigation Trust Assets can be liquidated and proceeds therefrom can be remitted to the MTE Litigation Trust Beneficiaries; and (iii) administrative services relating to the activities of the MTE Litigation Trust can be performed by the MTE Litigation Trustee. MTE Litigation Trust Assets are defined in the Plan, among other things, as all litigation claims belonging to the MTE Debtors or to MTE Holdings II LLC and the membership interests in the MTE Debtors and in MDC.  The MTE Litigation Trust Assets include the claims asserted herein.[2] Pursuant to the

---

[2] The MDC Litigation Trust, another Trust created pursuant to the Plan, recently filed a lawsuit against Mr. Siffin and some of his entities in Delaware bankruptcy court. That lawsuit includes claims similar to some of those asserted herein such as breach of fiduciary duty. However, it was always the intent of the Plan that the MTE Litigation Trust would have standing to pursue these types of claims as evidenced by the fact that the MTE Litigation Trust Assets include the membership interests in MTE and MDC.

Plan, the MTE Litigation Trust was established on September 17, 2021, and Thomas B. Bennett was subsequently named as Trustee of the MTE Litigation Trust. On varying dates, the Lenders assigned to the MTE Litigation Trust all claims the Lenders owned against Mr. Siffin and others relating to the Credit Agreement.  The assignments were specifically contemplated in the Plan.

9.      Defendant, Mr. Siffin, is an individual who, upon information and belief, is domiciled in the State of Florida and may be served with process at the following address: 527 Dilido Dr. E. Miami Beach FL 33139-1235.

10.     Defendant, Mr. Quinn, is an individual who, upon information and belief, is domiciled in the State of Indiana and may be served with process at the following address: 2801 Oak Way Trce, Westfield, IN 46074-0279.

11.     Defendant, Mr. Cyphers, is an individual who, upon information and belief, is domiciled in the State of Texas and may be served with process at the following address: 2413 Dartmouth Drive, Midland, TX 79705.

12.     Defendant, MDC Acquisition, is a limited liability company created under the laws of Indiana and may be served with process through its registered agent, Robert Quinn, 280 East 96th St. Suite 210, Indianapolis, IN 46240. Mr. Siffin is the sole member of MDC Acquisition.

13.     Defendant, Maefield, is a corporation incorporated in Indiana and may be served with process through its registered agent, Mark Siffin, 280 E. 96th Street, Suite 210, Indianapolis, IN, 46240. Mr. Siffin is the 100% owner of Maefield.

14.     Defendant, MDCE, is a limited liability company created under the laws of Indiana and may be served with process through its registered agent, Maefield Development Corporation, 280 E. 96th Street, Suite 210, Indianapolis, IN, 46240. Mr. Siffin is the sole member of MCDE.

### III.  JURISDICTION AND VENUE

15.     Mr. Bennett is a citizen of the State of Virginia.

16.     Mr. Siffin is an individual who, upon information and belief, is a citizen of Florida because he is domiciled in that State.  Upon information and belief, Mr. Siffin may also have residences in California, Texas, New York, and Indiana.

17.     Mr. Quinn is an individual who, upon information and belief, is a citizen of Indiana because he is domiciled in that State.

18.     Mr. Cyphers is an individual who, upon information and belief, is a citizen of Texas because he is domiciled in that State. Mr. Cyphers resides within this judicial district.

19.     MDC Acquisition is created under the laws of Indiana and its sole member is Mr. Siffin who, as set forth above, is a resident of the State of Florida.

20.     Maefield is incorporated in the State of Indiana and upon information and belief has its principal place of business in either Indiana or New York.

21.     MDCE is created under the laws of Indiana and its sole member is Mr. Siffin who, as set forth above, is a resident of the State of Florida.

22.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because Mr. Bennett and the Defendants are residents of different of states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

23.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) because this action arises in or relates to the Chapter 11 bankruptcy proceedings described above.

24.     This Court has personal jurisdiction over the Defendants because they have sufficient minimum contacts with the forum to warrant the imposition of jurisdiction over them by this Court.

25.     Venue of this case is proper under 28 U.S.C. §§ 1391(b)(2)(3) in that many of the acts and occurrences complained of herein occurred within this judicial district.

## IV.  FACTUAL BACKGROUND

### A.    Siffin's Oil and Gas Business Operations and the RBL Agreement

26.     MTE was formed in June 2014 to hold membership interests in MDC. MDC conducted oil & gas exploration, drilling and development operations in the Permian Basin in Texas, including Glasscock and Reeves counties.  MDC had no employees.  Pursuant to a management services agreement with MDC, Maefield provided management and related services to MDC utilizing its own employees.  This included the services of numerous dedicated fulltime employees located in Midland, Texas.  MDC was required to reimburse Maefield for the direct costs of providing these services without mark up.

27.     As stated, MTE owned a 100% membership interest in MDC.  MTE, on the other hand was owned 50% by MTE Partners LLC and Olam Energy Resources Energy I LLC. Mr. Siffin was the sole member of the entities that own and control MTE Partners LLC and Olam Energy Resources I LLC. Accordingly, Mr. Siffin, through a myriad of entities, owned and controlled both MTE and MDC.

28.     MDC funded its operations, in part, through a credit facility based on the amount of oil and gas reserves it had on hand at specified dates.  On September 17, 2018, MDC and Naxitis, New York Bank (and as Administrative Agent and Issuing Bank) ("Naxitis") entered into a Reserve Based Lending credit agreement (the "RBL Agreement").  A true and correct copy of the RBL Agreement is attached as Exhibit A.  Pursuant to the RBL Agreement, MDC could borrow funds from Naxitis and other lenders to the RBL Agreement against its oil and gas reserves in an amount based, in part, on MDC's "Proved Reserves" attributable to its oil and gas properties, together with, among other things, a projection of MDC's "rate of production and future net income, taxes, operating expenses and capital expenditures."  MDC's initial borrowing under the RBL Agreement was $60 million and no further draws were made under that agreement.  The RBL Agreement had certain

financial covenants requiring MDC to maintain specific financial ratios.  Not maintaining the required ratios was an event of default under the RBL Agreement.

## B.     The Credit Agreement and the Collateral Agreement

29.     On September 17, 2018, Riverstone Credit Management, LLC, as Administrative Agent and  Collateral Agent for the Lenders, the Lenders (the "Agent"), and MTE, entered into the Credit Agreement.  A true and correct copy of the Credit Agreement is attached as Exhibit B.  On September 17, 2018, the Agent and  MTE, entered  into  the  Collateral Agreement.  Under the Collateral Agreement, MTE pledged 100% of its member interests in MDC as collateral securing its obligations under the Credit Agreement.  A true and correct copy of the Collateral Agreement is attached as Exhibit C.

30.     The financing available to MTE under the Credit Agreement included the right to draw down up to $240 million on the Closing Date and  the additional aggregate amount of $235 million during a period of twelve months following the Closing Date.  Exhibit B §  2.1, Appendix A.  The Lenders did not agree to advance funds for general operational purposes.  Rather, the Lenders agreed to loan money for the specific purpose of developing specifically identified oil and gas assets.   MTE borrowed a total of $410 million under the Credit Agreement.

31.     Under the Credit Agreement, MTE must remain in  compliance  with  certain  key obligations that were carefully negotiated among MTE, the Lenders, and the Agent.  Among other obligations, MTE agreed to (1) maintain agreed ratios of (a) asset value to debt, and (b) debt to EBITDAX, (2) not incur any accounts payable that become more than 90 days past due, (3) avoid the incurrence of additional indebtedness in the form of mechanics liens, (4) keep current with financial reporting obligations, and (5) ensure that all representations to the Lenders are complete and true.   Exhibit B §§ 5.1, 6.1, 6.2, 6.7. As noted above, these covenants are typical financial covenants that commercial lenders often include in their loan documents and rely upon to protect themselves in

large commercial credit transactions.

32.     Each of MTE's commitments was intended to assure the Lenders that MTE could repay amounts it owed them.  Timely and accurate financial reporting was meant to provide the Lenders with critical information regarding the financial condition and status of MTE  and enable the Lenders to track the promised and proper use of funds they advanced. Hence, the Lenders justifiably relied upon MTE's and Mr. Siffin's representations, and the representations of Mr. Quinn and Mr. Cyphers, regarding MTE's compliance with these covenants.

33.     MTE also agreed in the Credit Agreement that its wholly owned operating company, MDC, would comply with other loan agreements to which it is party, including the RBL Agreement discussed above.  Exhibit B § 8.1(b).  MDC's compliance with the RBL Agreement was of critical importance to the Lenders because, under Section 9.04(c) of the RBL Agreement, if MDC was in default under such agreement, it could not distribute to MTE, its parent company, the cash necessary for MTE to make payments under the Credit Agreement.

34.     The Credit Agreement also identifies how MTE may use funds advanced by the Lenders.  The Lenders did not agree to advance funds to MTE for general corporate purposes, and the Credit Agreement was not a revolving or liquidity facility intended for such use.  Rather, the Lenders agreed to advance the Delayed-Draw Loans for the specific purpose of developing the assets specified within the Approved Plan of Development (the "APOD").  The APOD would list various oil and gas properties and specifically identified how MDC could make capital expenditures to develop them.  The APOD was a carefully negotiated document that contours the Lenders' and MTE's development risk.  MTE agreed to spend the proceeds of the Delayed-Draw Loans solely in compliance with the APOD.   Exhibit B § 2.4.

35.     Sections 8.1 and 8.2 of the Credit Agreement identify certain specific breaches of the Credit Agreement that constitute "Events of Default" and entitle the Agent, on behalf of the Lenders,

to cease further funding under the Credit Agreement, accelerate the debt, and enforce any liens and security interests under the Collateral Agreement.

### C.   Materially False Certification in Connection with the First Amendment

36.     Within weeks after execution of the Credit Agreement, MTE defaulted under Section 8.1(c) by breaching certain financial covenants and drilling wells not authorized by the APOD.  As of September 30, 2018, MTE had failed to maintain a leverage ratio of less than 4.75 to 1.00 and failed to maintain an interest coverage ratio of greater than 2.00 to 1.00 as required by Credit Agreement Sections 6.7(a) and 6.7(b), respectively.  These Credit Agreement covenants exist because excessive debts or the inability to fund interest expenses demonstrate the financial condition of a company and disclose its actual ability to make required payments to its creditors. Moreover, the Credit Agreement covenants are standard covenants that lenders in the normal course of business rely upon in large commercial transactions such as this one.

37.     Negotiations respecting a potential waiver of these breaches between MTE, the Agent, and its Lenders began almost immediately. Following months of negotiation, MTE, the Lenders, and the Agent entered into the Limited Waiver and First Amendment to Term Loan Credit Agreement (the "First Amendment") dated February 22, 2019, in which MTE admitted (in Recital B) that it had failed to maintain the required leverage and interest coverage ratios required by the Credit Agreement. A true and correct copy of the First Amendment is attached hereto as Exhibit D.

38.     MTE also admitted in Recital B of the First Amendment that it had begun making capital expenditures associated with the drilling of wells identified on Schedule I of the First Amendment  that were not authorized by the then-effective APOD in violation of Section 5.13 and Section 6.20 of the Credit Agreement.

39.     Mr. Siffin requested that the Lenders waive these specified defaults in exchange for MTE's agreement to pay all outstanding fees and certain additional expenses associated with the First

Amendment and enter into a new APOD. The Agent and the Lenders executed the First Amendment to provide a limited waiver of the aforementioned defaults and amended the Credit Agreement to assist MTE in avoiding a future default. Specifically, the Agent and the Lenders agreed to an amendment not to test the leverage ratio or the interest coverage ratio for MTE for the Fiscal Quarter ended December 31, 2018.

40.    The First Amendment also put a new APOD in place, which remained effective for six months. After this six-month period, MTE agreed (in Section 4 of the First Amendment) to submit a new APOD for approval by the Lenders in accordance with Credit Agreement Section 5.13. In connection with signing the First Amendment, the Agent and the Lenders discussed with MTE that MDC's drilling results up to that point had been disappointing, and that the Agent and the Lenders believed MDC's then-current pace of drilling was too fast and likely to result in mistakes. The agreed new APOD reflected a negotiated understanding that MDC would change its drilling pace to move more deliberately and attempt to apply lessons learned during the fall drilling campaign that had violated the APOD.

41.    Unbeknownst to the Agent and the Lenders at the time of execution of the First Amendment, MTE had already defaulted under other provisions of the Credit Agreement.

42.    To obtain the First Amendment, MTE— at Mr. Siffin's behest —certified that, other than the specified defaults identified under the First Amendment, no default or Event of Default had occurred or was continuing. On February 19, 2019, Mr. Cyphers provided the Lenders with a Compliance Certificate executed by Mr. Quinn, in his capacity as CFO of MTE, and at Mr. Siffin's behest, representing that "no Default or Event of Default has occurred and is continuing" under the Credit Agreement. A true and correct copy of the Compliance Certificate is attached hereto as Exhibit E. Mr. Cyphers also provided the Lenders with financial statements for 2018, which, as will be discussed in detail below, were fraudulent (hereinafter the "February 19, 2019 financial statements").

The First Amendment was executed on February 20, 2022.  As will be explained more fully below, the misrepresentations in the February 19, 2019 Compliance Certificate were materially false because several events of default, unbeknownst to the Lenders, had already occurred.  Moreover, Mr. Siffin, Mr. Quinn and Mr. Cyphers knew the representations were materially false. The facts demonstrating this knowledge are set forth below. The Lenders justifiably relied on  Mr. Siffin's,  Mr. Quinn's and Mr. Cyphers representations in making their decision to enter into the First Amendment.

###     D.     Mr. Siffin's Materially False Certification in the February Borrowing Notice

43.     Two days after the execution of the First Amendment, on February 22, 2019, Mr. Siffin, on behalf of MTE, submitted a Borrowing Notice in the amount of $40 million (the "February Borrowing Notice").  Pursuant to Credit Agreement Sections 2.3 and 3.2(f), Mr. Siffin, through this Borrowing  Notice, represented and warranted that MTE was not then in default of any of its obligations.  A true and correct copy of this Borrowing Notice is attached as Exhibit F.  On February 27, 2019, in justifiable reliance on MTE's representations in the Borrowing Notice, which is a standard notice used by lenders in commercial transactions, and which they did not then know to be false, the Lenders fully funded MTE's request for an additional $40 million.

44.     Similar to the misrepresentations made in obtaining the First Amendment, Mr. Siffin's representations in the February Borrowing Notice that no Event of Default had occurred were materially false.  Specifically, an Event of Default had occurred as a result of MTE's subsidiary defaulting on its debt obligations. MDC had permitted its Current Ratio to be less than 1.00 to 1.00 as of the last day of the 2018 Fiscal Year in violation of RBL Agreement Section 9.01(b).  Under the RBL Agreement, the Current Ratio is the ratio of (i) consolidated current assets (excluding non-Cash assets) of MDC and its subsidiaries to (ii) consolidated current liabilities (excluding non-Cash obligations) of MDC  and its subsidiaries.  In other words, MDC's current liabilities could not exceed its current assets in order to be in compliance with the financial covenants. This, however, is exactly

what occurred, which created an Event of Default under Credit Agreement Section 8.1(b).

45.    On February 19, 2019, Mr. Cyphers provided the Lenders with year-end unaudited 2018 financial statements for MTE and its subsidiaries.  A true and correct copy of the February 19, 2019, financial statements is attached as Exhibit G.  MTE, through Mr. Siffin, and others acting at his direction, including Mr. Quinn and Mr. Cyphers, then drew $120 million dollars under the Credit Agreement, based on materially false financial representations.  Months later, in July 2019, when Mr. Siffin  finally got around to submitting draft "audited" financial statements for 2018—proffering the excuse that their auditor had "staffing shortcomings"— the Lenders learned for the first time that the initial financial statements for MTE had omitted more than $114 million in accrued liabilities for activity in 2018.  These accrued liabilities derived from drilling expenses and were incurred in 2018.  Had these liabilities been included in the February 2019 statements provided to the Lenders, it would have revealed to the Lenders that MDC was not in compliance with the financial covenants in the RBL Agreement and thus there was a default under the Credit Agreement. These July financial statements revealed that MDC was woefully out of compliance with the Current Ratio set forth in Section 9.01 (b) of the RBL Agreement. Moreover, the accurate disclosure of the Current Ratio in February 2019 would have alerted the lenders to the fact that MTE and MDC were in poor financial condition such that the lenders would not have advanced additional funds.

46.    As explained above, the RBL Agreement required a Current Ratio of 1.0 to 1.0.  In July 2019, when MTE belatedly provided draft audited financial statements to the Lenders, the financial statements revealed that MTE's current assets for Fiscal Year 2018 were actually $145,265,527 and its current liabilities were in fact $184,025,219 (an increase of $114,243,462 from the amount provided in February 2019) resulting in a dramatically lower Current Ratio of 0.79.  A true and correct copy of the draft financials that MTE delivered to the Agent on July 19, 2019, is attached as Exhibit H.  In other words, MTE underreported its liabilities by an amount in excess of

$114 million when Mr. Siffin executed the First Amendment and the February Borrowing Notice. An additional $114 million in current liabilities was a material fact that Mr. Siffin, Mr. Quinn and Mr. Cyphers hid from the lenders. A second set of draft audited financial statements provided in October 2019, when the Agent exercised its inspection rights, show that MDC's Current Ratio for Fiscal Year 2018 was even lower— just 0.68. A true and correct copy of the second set of draft audited financial statements MTE delivered to the Agent in October 2019 when the Lenders exercised their inspection rights is attached as Exhibit I.

47.     MDC's noncompliance with the RBL Agreement's Current Ratio requirement as of December 31, 2018, demonstrated that its current liabilities far exceeded its current assets—an indicator of financial distress that would have been highly relevant to the Agent's and the Lenders' decision to enter the First Amendment and to advance additional funds through the February Borrowing Notice. Indeed, when the auditors discovered the additional $114 million in liabilities while preparing the financial statements, the auditors considered issuing a going concern opinion.

48.     Mr. Quinn, the CFO of MDC, but who described himself as a "CFO in name only," and who stated he did not deal with day to day matters for MDC, could not explain why the $114 million was not included in the February 19, 2019 financial statements sent to the Lenders. He acknowledged, however, that the inclusion of the $114 million on MTE's financial statements brought MTE and MDC out of compliance with the ratio requirements set forth in the RBL Agreement. Mr. Cyphers, the COO of MDC and in his capacity as a Rule 30(b)(6) witness in the bankruptcy, testified that he only realized the $114 million had been omitted in the summer of 2019, after the company's audit was underway. Mr. Cyphers further conceded that no investigation was undertaken to determine how or why $114 million—representing a quarter of MDC's total asset value—was omitted from the financial statements or whether the omission constituted a failure in internal controls.

49.     The e-mail traffic with Weaver, the outside auditors, reveals that Weaver had recognized this as a problem since at least May 14, 2019, over three months before this problem was disclosed to the Lenders.  Specifically, on May 14, 2019, Weaver forwarded draft financial statements that indicated that the Current Ratio stood at .65 - well below the required Current Ratio of 1.0 to 1.0 set forth in the RBL Agreement.  At this time, Weaver was reporting accounts payable – trade – of $140 million, which was a substantial increase over what had been reported to the Lenders in February of 2019.

50.     On July 22, 2019, Weaver forwarded the financial statements that reflected the $114 million in accrued liabilities.  The accounts payable – trade – that had been reflected at $140 million in the financial statements provided on May 14 financial statements had been reduced to $45 million, but overall current liabilities increased by almost $20 million.  These financial statements put the Current Ratio at .62.  Weaver recognized this as a serious issue.

51.     On July 22, 2019, the same day the draft financial statements were submitted by Weaver, the lead partner raised the issue with MTE of a "going concern" disclosure being necessary. Under the applicable accounting standards, an entity's financial statements are prepared under the assumption that the entity will continue as a going concern, until liquidation is imminent.  Before liquidation is deemed imminent, an entity may have uncertainties about its ability to continue as a going concern.  In such situations the entity may be required to disclose information about its ability to continue as a going concern, depending on the level of uncertainty and management's plans to mitigate the uncertainty.  Having to make a "going concern" disclosure is an extremely negative event for a company.

52.     According to the Weaver lead partner, "[c]urrently the entities have covenant violations on the Current Ratio for the RBL [Agreement], negative cash flows from operations (primarily driven by accrued CAPEX) and a history of operating losses (but positive EBITDA)."  He

then went on to say ""[l]ast year we didn't have to address the issue because of the debt restructure, but this year since the debt is staying the same, I believe a disclosure is required." The Weaver partner also forwarded what the "going concern" disclosure would look like.

53.     This obviously put Mr. Siffin and his cohorts into panic mode, knowing that such a disclosure would surely doom them. As Mr. Cyphers explained to Messrs. Siffin and Quinn, "[t]he going concern disclosure basically says they are not sure if MDC can last another year given the Current Ratio and the net losses that resulted from transactions below the EBITDA line (reserve depletion & interest expense primarily). This is not allowed in the credit docs." They then began in earnest to convince Weaver that such a disclosure was not necessary. Weaver indicated a willingness to re-consider and, in that regard, asked whether the Current Ratio issue had been resolved in 2019, which according to Weaver "might help." Mr. Cyphers responded that "[w]e have crawled out of the hole quite a bit; however, it will take the debt draw to get out completely." The debt draw referred to by Mr. Cyphers was the $65 million April 18 borrowing request that is discussed below. As Mr. Cyphers well knew at the time he made this statement to Weaver, MTE knew full well that this draw was not going to happen. Ultimately, Weaver acquiesced to the pressure (in apparent reliance on the upcoming $65 million draw) and issued draft financial statements without the going concern disclosure and those statements were provided to the Lenders on August 5, 2019.

54.     Regardless of when Weaver caught the fraudulent misrepresentations in the financial statements presented to the Lenders in February, the reality is that the omission of the $114 million from the financial statements was done intentionally and with the intent to defraud the Lenders. Indeed, the evidence shows that Mr. Siffin,  Mr. Quinn and Mr. Cyphers knew  their representations were false or made them recklessly as a positive assertion without any knowledge of its truth. Indeed, on January 31, 2019, Messrs. Cyphers, Quinn, and Siffin had an email exchange about the current liabilities and current assets of MDC. Noting that "[c]urrent assets to current liabilities has to be at

least 1:1," Mr. Cyphers informed Mr. Siffin, and Mr. Quinn that he believed they had violated the covenant as of December 31, 2018, and that the "current ratio looks like a bust."

55.    Nevertheless, 19 days later, the February 19, 2019 financial statements were delivered to the Lenders, sworn to by Mr. Quinn, as CFO of MTE, which showed the Current Ratio in compliance and omitted the $114 million in liabilities.  When asked at a deposition to explain how it was possible that the $114 million was not found when they were specifically looking at the very issue 19 days before delivering the financial statements and compliance certificate, Mr. Cyphers testified that it was "impossible for him to state with certainty" because he had no memory of how it was determined at the beginning of February that MDC was not then in default. The January 31 e-mail is no outlier.  Mr. Siffin and his crew, including Mr. Quinn and Mr. Cyphers, were acutely aware of the Current Ratio issue throughout 2019.  Indeed, Mr. Cyphers later conceded to Weaver on July 23, 2019, that "[w]e have not cured the current ratio in 2019."  According to Mr. Cyphers the plan to cure this problem was a $65 million draw from the Lenders, which, as will be discussed below, never occurred.  Thus, the plan to cure the Current Ratio problem was to make misrepresentations to the Lenders to induce them to loan more money that would, in turn, "solve" the Current Ratio issue.

56.    Furthermore, numerous drafts of the financial statements were created before the February 19, 2019 financial statements that were presented to the Lenders.  These financial statements reflect a remarkably different financial picture than the February 19, 2019 financial statements.  For example, financial statements created on January 31, 2019, show a significant issue with the Current Ratio.  These financial statements reflect a Current Ratio of .51 (far below the required 1.0 to 1.0). The January 31 creation date for these financial statements is significant because this is the same date as the e-mail from Mr. Cyphers  to Mr. Siffin and Mr. Quinn declaring the Current Ratio "a bust."

57.    Financial statements created on February 14, 2019, paint a similarly bleak picture as it relates to the Current Ratio.  These financial statements reflect a Current Ratio of .49 (again, far

below the required 1.0 to 1.0).  It was not until February 15, 2019, that financial statements were created that reflected that the Current Ratio had been miraculously resolved.  These ever-evolving financial statements conclusively demonstrate that Mr. Siffin,  Mr. Quinn, the CFO of MTE, and Mr. Cyphers, the COO of MTE, knew that the February 19, 2019 financial statement was fraudulent and was submitted to the Lenders in an effort to fraudulently induce them into entering into the First Amendment and making subsequent draws under the Credit Agreement.

58.     The sheer magnitude of this issue also supports the notion that this was done intentionally.  This $114 million was roughly a quarter of MDC's asset value.  It also represented more than twelve times the beginning period cash on the cash flow statement had been spent.  This was no mistake.  It was intentional and concealed from the Lenders that MDC was out of compliance with the RBL Credit Facility Agreement's Current Ratio requirements—creating a cross-default under Credit Agreement Section 8.1(b).

59.     Moreover, and contrary to the representations in connection with both the First Amendment and the February Borrowing Notice, MTE was also in default as of February 20, 2019, and February 22, 2019, because two mechanics liens -- one by Wellbore Fishing and one by Wilbanks Trucking Services in the total amount of $1,057,483.59 -- had already been filed against the Debtors and were outstanding.  True and correct copies of these mechanic's liens are attached hereto as Exhibit J.  The creation of mechanics liens violates Credit Agreement Section 6.2 and constituted an Event of Default under Section 8.1(c). The filing of these mechanics' liens by unpaid vendors, and the numerous mechanic liens that were subsequently filed over the next several months, indicated that MTE and its related entities, including MDC, were not paying their bills as they became due and were in financial distress.

60.     Furthermore, the evidence shows that Mr. Siffin knew about the filing of these liens. Indeed, both Mr. Cyphers, MDC's COO, and Mr. Quinn, MDC's ostensible CFO, testified in the

bankruptcy proceedings that Mr. Siffin was heavily involved with issues relating to late vendor payments.  Moreover, Mr. Siffin, through MDC Acquisition, actually invoiced MDC for his services in connection with "Vendor and Loan management" for January 2019 – April 2019, and was, in fact, paid $4 million for these alleged services.  As will be discussed in more detail below, this invoice was part of Mr. Siffin's scheme to steal $8.5 million on the eve of bankruptcy.   Additionally, notice of the filing of these mechanic's liens were sent to addresses associated with MDC and Mr. Siffin prior to the representations Mr. Siffin made on February 20 and 22, 2019.  The liens were recorded on February 4 and 11, 2019.  These liens were recorded pursuant to Chapter 56 of the Texas Property Code.  Section 56.021(b) requires that "[n]ot later than the 10th day before the day the affidavit is filed, a mineral subcontractor claiming the lien must serve on the property owner written notice that the lien is claimed." Wellbore Fishing gave notice of the liens no later than February 7, 2019, when it sent a letter enclosing the lien affidavit to MDC at three of its addresses.  The evidence shows that MDC knew about the Wellbore lien no later than on February 14, 2019, when its registered agent forwarded the notice to  MDC.  Likewise, Wilbanks Trucking  filed its lien on February 11, 2019 listing MDC's Texas address. Accordingly, Mr. Siffin, who owned and controlled MTE and MDC, and who was paid millions of dollars for vendor management, had notice of the mechanics liens prior to the execution of the First Amendment and the February Borrowing Notice.

61.     MTE was also in default under Credit Agreement Section 8.1(c) because MDC had incurred indebtedness in the form of accounts payable overdue in excess of 90  days,violating Credit Agreement Section 6.1. At the time of the First Amendment and February Borrowing Notice, MDC's accounts payable in excess of 90 days past due totaled at least $4,868,117.  This information comes directly from the accounts payable data of MDC. Mr. Siffin,  Mr. Quinn and Mr. Cyphers, however, failed to disclose this information when the First Amendment, along with the Compliance Certificate, was executed, and the February Borrowing Certificate was executed stating no event of default had

occurred.

62.     Despite these clear defaults, Mr. Siffin, Mr. Quinn and Mr. Cyphers certified that, other than the specified defaults previously identified under the First Amendment, which did not include any of the foregoing, no default or Event of Default had occurred or was continuing. This was a materially false representation made by Mr. Siffin, Mr. Quinn and Mr. Cyphers. Indeed, as shown above, Mr. Siffin, Mr. Quinn and Mr. Cyphers knew their representations were false or made them recklessly as positive assertions without any knowledge of their truth. Mr. Siffin was paid millions of dollars for "vendor management." Moreover, Mr. Quinn testified that Mr. Siffin, along with Mr. Cyphers, managed the vendor relationships, and was responsible for vendors getting paid. Mr. Quinn further stated that Mr. Siffin, who worked closely with the vendors, working with anywhere from 100-200 vendors at a time, determined which vendors were to be paid, and was the one who authorized MDC to pay $9.1 million to MDC Acquisition so MDC Acquisition could pay the vendors who had invoices outstanding before the Lenders locked down the funds. Finally, MDC's own internal financial records demonstrated that MDC, the company Mr. Siffin owned and controlled, and for which Mr. Quinn served as CFO and Mr. Cyphers as COO, had millions of dollars in 90 days plus account payables as of January 31, 2019. Mr. Siffin, Mr. Quinn and Mr. Cyphers also knew that if the Lenders knew about MTE's actual, precarious financial condition, reflected in the fact that it had $114 million in unreported liabilities, mechanics liens were being filed against it and it had millions of dollars in accounts payable more than 90 days past due, that the Lenders would never had agreed to the First Amendment and would never have advanced an additional $40 million pursuant to the February Borrowing Notice. The Lenders, however, knew none of these things and, thus, actually and justifiably relied upon Mr. Siffin's, Mr. Quinn's and Mr. Cyphers's representations made in standard commercial disclosures when the Lenders advanced an additional $40 million to MTE.

E.      **MTE Submits Borrowing Notices with False Certifications in March and April.**

63.     Just three weeks later, on March 18, 2019, MTE, upon information and belief at the behest of Mr. Siffin, submitted a second Borrowing Notice in the amount of $20 million. This Borrowing Notice was executed by Paul Cyphers, as COO of MTE. Again, pursuant to Credit Agreement Sections 2.3 and 3.2(f), this Borrowing Notice represented and warranted that MTE was not then in default under any of its obligations.  A true and correct  copy  of  this  Borrowing  Notice is  attached  as Exhibit K (the "March Borrowing Notice").

64.     For the reasons set forth above, this representation in the March Borrowing Notice was materially false.  Additionally, as of March 18, 2019, MTE continued in default under the Credit Agreement because now thirty-three mechanics liens – the ones by Wellbore Fishing and Wilbanks Trucking Services discussed above, plus an additional seventeen by Trans Tex Cementing Services LLC, and fourteen by Trans-Tex Dyno Services—all in the collective amount of $3,081,267.07— now existed against MDC's assets. True and correct copies of these mechanic's liens are attached as Exhibits L.  The false certification concealed the existence of these thirty-three mechanics liens. Because as explained above, Mr. Siffin and Mr. Cyphers  were working with the vendors regarding these late payment issues,  they knew these representations were false or they were made recklessly as positive assertions without any knowledge of their truth.

65.     As shown, Wilbanks 'mechanic liens were filed on February 11, 2019.  The property owner is listed as MDC Texas Operator, LLC and MDC Texas Energy LLC. Both are companies Mr. Siffin owns and/or controls. The address for MDC is listed in the lien affidavits. Moreover, Wilbanks sent a request for payment to MDC by wire transfer on March 1, 2019. The mechanic's liens for Trans Tex were filed on March 8, 2019,  ten days before the March Borrowing Notice was signed.  Each lien affidavit provides that it was sent to an address associated with the MTE entities.  Moreover, MDC's own records show that as of January 31, 2019, MDC's 90 day plus accounts payable with

Trans Tex exceeded $867,000, with Wilbanks $560,000 and with Wellbore $81,000. Further, as shown above, Mr. Siffin was the person in charge of vendor payment and vendor management and was the one who worked with vendors on a regular basis, with Mr. Cyphers's assistance. Based on this evidence, Mr. Siffin and Mr. Cyphers knew about the additional mechanics liens before the March Borrowing Notice was submitted.

66.     It should also be noted that the work performed by these vendors was finished as far back as July 2018 through October 2018, yet these vendors, who were owed millions of dollars, had not been paid for 6-8 months by the time the March Borrowing Notice was signed. Indeed, as of March 18, 2019, MDC had additional indebtedness in accounts payable over 90 days past due in the amount of at least $7,447,727. This information comes directly from the accounts payable data of MDC. The amounts due over 90 days in excess of $7.4 million constituted a default under Credit Agreement Section 8.1(c) because MDC had incurred indebtedness in the form of accounts payable overdue in excess of 90 days, violating Credit Agreement Section 6.1. Nevertheless, MTE, at Mr. Siffin's behest, represented in the March Borrowing Notice signed by Mr. Cyphers that no event of default had occurred.

67.     In addition, and as described above, as of the March Borrowing Notice date, MDC defaulted under the RBL Credit Facility Agreement by failing to maintain a Current Ratio not less than 1.00 to 1.00. Mr. Siffin, Mr. Quinn and Mr. Cyphers failed to disclose this fact to the lenders and instead concealed the fact that the financial statements did not include an additional $114 million in liabilities. As noted above, although not then disclosed to the Lenders, as of December 31, 2018, MDC's Current Ratio was 0.68.

68.     On March 28, 2019, the Lenders, in justifiable reliance on Mr. Siffin's and Mr. Cyphers representations in the March Borrowing Notice, which they did not then know to be false, fully funded MTE's request for $20 million.

69.     Two weeks later, on April 1, 2019, MTE, upon information and belief at Mr. Siffin's instruction, submitted a third Borrowing Notice in the amount of $60 million (the "April 1 Borrowing Notice").  A true and correct copy of the April 1 Borrowing Notice is attached at Exhibit M.  This Borrowing Notice was again executed by Mr. Cyphers in his capacity as COO of MTE Holdings, LLC. By this point, the Lenders were becoming concerned that MTE through Mr. Siffin was seeking to withdraw more than half of the $235 million in Delayed-Draw Loans less than two months following execution of the First Amendment in February.  The frantic spending pace was hard to reconcile with MTE's agreement in the First Amendment's APOD that should have *slowed* the pace of spending.  In light of these concerns, the Lenders insisted that MTE agree to include an additional certification in the April Borrowing Notice, specifically that "[a]fter giving effect to the Loans … [MTE] will be in compliance in all material respects with all operating and financial covenants set forth in the Credit Agreement on the date hereof and as of the last day of each Fiscal Quarter ending prior to the Maturity Date." Exhibit M ¶ 6.

70.     Accordingly, the April 1 Borrowing Notice, signed by Mr. Cyphers and executed at the behest of Mr. Siffin, represented and warranted that MTE was not then in default, and that MTE, after receiving the requested loans, would not be in default in future fiscal quarters.  These representations were false for all the reasons set forth above.   As of April 1, 2019, MTE was in default (1) because the thirty-three mechanics liens described above remained outstanding against MDC's assets (Exhibits L), (2) because MDC had permitted its Current Ratio to fall to 0.68 in violation of the RBL Credit Facility Agreement, (3) because MDC had accounts payable over 90 days past due in the amount of at least $9,170,162 as of April 1, 2019 (Exhibit N), and (4) because of the materially false certifications  Mr. Siffin,  Mr. Quinn and Mr. Cyphers had made to the Lenders, in the First Amendment and the prior Borrowing Notices, described above. Moreover, as the Agent and the Lenders would later learn when they received the MTE's unaudited internal

23

financial statements for the quarters ended March 31, 2019, and June 30, 2019, MDC had breached and would continue to breach the RBL Agreement and Credit Agreement by permitting its Current Ratio to remain below 1.00 to 1.00 for these quarters. As of March 31, 2019, MDC's Current Ratio was 0.91, while it plummeted to 0.64 by June 30, 2019.

71.     On April 11, 2019, in justifiable reliance on MTE's representations in the third Borrowing Notice, which they did not then know to be false, the Lenders fully funded MTE's request for $60 million.

72.     On April 18, 2019, MTE submitted a fourth Borrowing Notice. A true and correct copy of this Borrowing Notice is attached as Exhibit O. This one was also executed by Mr. Cyphers as COO of MTE Holdings LLC at the behest of Mr. Siffin. The April 18, 2019, Borrowing Notice contemplated a $65 million draw, the remainder of the credit facility. Thus, just eight weeks after the First Amendment, MTE had submitted four Borrowing Notices for an aggregate amount of money that was intended to last MTE for approximately seven months.

73.     In light of the Lenders' discomfort with MTE's April 1, 2019, Borrowing Notice, the Agent believed that MTE's rapid pace of spending, combined with the poor production results discovered in the process of negotiating the First Amendment and the unknown and uncertain results of MDC's then-current drilling activity, would raise questions among the Lenders.

74.     Upon receipt of the April 18, 2019, Borrowing Notice, the Agent communicated its concern to MTE. Ultimately, MTE informed the Agent that it would not proceed on its April 18, 2019, Borrowing Notice.

75.     Under any circumstances, MTE was not entitled to draw any funds pursuant to the April 18, 2019 Borrowing Notice because it was then in default (1) due to the thirty-three outstanding mechanics liens described above, (2) because MDC had permitted its Current Ratio to fall to 0.68 as of December 31, 2018, in violation of the RBL Credit Facility Agreement, (3) because

MDC had accounts payable over 90 days past due in the amount of at least $10,544,884 as of April 18, 2019 (Exhibit N), and (4) because of the materially false certifications MTE had made to the Lenders in conjunction with the First Amendment and the subsequent three Borrowing Notices, as described above.

###### F.    Mr. Siffin Breaches His Fiduciary Duties and Steals $8.5 Million on the Eve of Bankruptcy

76.    It is undisputed that, in the months leading up to the bankruptcy filings, Mr. Siffin caused $8.5 million to be transferred to an entity he owns and controls, MDC Acquisition.  Mr. Siffin admits these payments were made, but he claims those payments were made for a legitimate purpose, even though the rationale for these payments kept changing.  However, discovery in the bankruptcy proceeding eviscerates that claim. Furthermore, these payments were made at a time when MDC was hemorrhaging cash, was not paying its vendors, was having mechanics liens filed against it, and was done shortly before MTE and MDC both filed bankruptcies.

77.    At the outset, this "fee" paid to MDC Acquisition was purportedly reflected in invoices generated by Mr. Quinn, who —as discussed herein— was MDC's titular CFO but who, in fact, did little or nothing to fulfill the duties of that position.

78.    The evidence shows, however, that these invoices are nothing more than an attempt to provide after-the-fact justification for payments that had no legitimate basis.  Indeed, Mr. Quinn confirmed the invoices were not finalized until *after* the bankruptcy proceedings were filed, and Mr. Cyphers has testified that he saw the invoices for the first time when the bankruptcy cases were filed and did not know that the fees would total $8.5 million until that moment.  The fact that these invoices were finalized only after the bankruptcy petitions were filed, and months after the payments were made, is only part of a narrative underscoring the dishonest purpose behind the $8.5 million payment.

79.     As noted above, MDC has no employees. Instead, it is a party to a Management Services Agreement ("MSA"), dated August 27, 2014, between MDC and MDC Texas Energy LLC, on the one hand, and Maefield, on the other.  Pursuant to the MSA, Maefield, another entity owned and controlled by Mr. Siffin, was appointed as an "independent contractor" to perform services on behalf of MDC, including oil and gas exploration, development, operation, and production, as well as all associated administrative and regulatory requirements.

80.     Under the MSA, Maefield was required to retain personnel to perform those services, as well as to bear any other expenses and disbursements required to meet its responsibilities.  MDC, in turn, was obligated to reimburse Maefield for the costs of employment and other expenses, as well as an annual payment of $50,000 for the cost of providing a CFO to MDC but was not required under the MSA to pay any fee to Maefield over and above the costs incurred.

81.     MDC financial records show that, throughout 2018, these payroll expenses were reimbursed by MDC to MDC Acquisition, not Maefield.  Thus, in 2018, MDC paid $5,622,572.92 to MDC Acquisition, all of which appears to have been used to fund MDC's payroll expenses.  However, this arrangement changed drastically in 2019, with MDC Acquisition purportedly assuming a "cash management role." There is no written agreement between MDC and MDC Acquisition, companies which Mr. Siffin controls, for these purported services.  Nevertheless, between February and October 2019, funds transferred from MDC to MDC Acquisition increased dramatically.  MDC made direct payments to MDC Acquisition during that time totaling $14,420,883.41 and, in fact directed a counterparty who owed MDC $9,101,439.79 to pay that amount to MDC Acquisition, bypassing MDC altogether. In total, between February and October 2019, MDC Acquisition received funds totaling $23,522,323.20—more than four times what had been paid to MDC Acquisition in all of 2018.

82.     Much of this money was used to fund MDC's payroll and other expenses, in an apparent attempt to defraud the lenders by keeping the funds outside of MDC bank accounts; however, $8.5 million remaining at the end of October 2019, just before the bankruptcy petitions were filed, was retained as the "fee" supposedly charged by MDC Acquisition to MDC. As explained by Mr. Quinn, the invoices were created "when all the ins and outs of the cash were completed and we had determined that the net was $8.5 million in fees and then [the final invoices] were created to allocate [the fees] back to the months where we determined they were earned." Thus, the payment to MDC Acquisition (in reality Mr. Siffin) had no real nexus to work allegedly performed but was based instead upon amounts that were simply left in MDC Acquisition's account once the music stopped.

83.     Further, the "draft" and "final" invoices prepared by MDC Acquisition, and approved by Maefield, in an effort to substantiate this $8.5 million payment confirm the illegitimacy of the payments.  For example, on April 11, 2019, at Mr. Siffin's direction, Mr. Quinn, as CFO of Maefield, created a draft invoice in the amount of $2.5 million, explaining in a contemporaneous email that the payment was to be considered a "commission" earned by Mr. Siffin associated with an oil offtake transaction with a company called ETC, as well as a water services transaction with an entity called WaterBridge.  Other draft invoices were approved by Maefield in the amounts of $3,000,000 and $3,300,000 on April 15, 2019 and June 5, 2019. Each of these invoices were sent to Mr. Cyphers as COO of MDC for payment.

84.     Leaving aside the fact that there was no written agreement between MDC and MDC Acquisition for the payment of any commission, Mr. Quinn said he had no idea what percentage of the transaction amount Mr. Siffin was entitled to receive as a supposed commission because the ETC and WaterBridge transactions never closed.  Thus, no commission could ever have been earned.  Mr. Quinn knew this by April 11, 2019, when he blindly prepared the $2.5 million invoice as instructed by Messrs. Siffin and Cyphers.

85.     Three days later, on April 15, 2019, Mr. Quinn was instructed to revise the April 11 invoice, increasing it from $2.5 million to $3 million.  Incredibly, Mr. Quinn and Mr. Cyphers did not ask a single question as to why, over the course of a weekend, the payment to MDC Acquisition (and, thus, Mr. Siffin) rose by $500,000.  Nor did Mr. Quinn, the company's ostensible CFO, or Mr. Cyphers, the COO, ask any questions when, on June 5, 2019, he was instructed to create yet another draft invoice for purported commissions earned by Mr. Siffin, this time for $3.3 million.  Mr. Quinn's and Mr. Cyphers lack of concern regarding the legitimacy of these invoices further evinces the total control Mr. Siffin exercised over MTE and MDC.

86.     While Mr. Quinn explained that the invoices discussed above were "drafts," the "final" invoices likewise raise more questions than they answer.  The $4 million invoice dated April 11, 2019, was purportedly for "services related to ETC and WaterBridge transactions," as well as for "vendor and loan management" between January and April 2019.  But neither Mr. Quinn nor Mr. Cyphers—MDC's Rule 30(b)(6) witness in the bankruptcy proceedings—could explain why it was necessary for MDC Acquisition (i.e., Mr. Siffin) to provide those vendor and loan management services when Maefield was required to do so pursuant to the MSA, under which MDC was not required to pay any additional fee.  Nor has there been any explanation as to why activities like vendor and account management are not simply within Mr. Siffin's responsibilities as CEO.  Further, the June 30 and July 31 invoices mentioned above average to $1.5 million per month for "vendor and loan management", yet neither Mr. Quinn nor Mr. Cyphers were able to provide any detail as to how much work Mr. Siffin actually performed, whether measured in hours or otherwise, let alone any information substantiating an entitlement to an annualized salary of $18 million.

87.     The next "final" invoice, dated June 30, 2019, omits from its description any mention of contemplated transactions like those involving WaterBridge or ETC, and instead simply invoices MDC $3 million for "vendor and loan management" during the months of May and June of 2019.

Likewise, a July 31, 2019, invoice states that MDC Acquisition is due $1.5 million for vendor and loan management services supposedly rendered in July 2019.

88.    Making matters worse, Mr. Siffin then proceeded to fraudulently transfer these funds to personally benefit himself and  entities he owned and controlled.  First, Siffin transferred $3.5 million to various real estate projects owned by Maefield or its affiliates, including an increase of $3.2 million to the interest reserve in connection with Mr. Siffin's real estate investment through Maefield at 20 Times Square in New York City.  In addition, $1.5 million of the $8.5 million in payments to MDC Acquisition was sent to MDCE, a single-member LLC owned by Mr. Siffin.  Upon information and belief, the remainder of the $8.5 million was used to fund Maefield and MDC Acquisition's operations.  In sum, the evidence shows that the MDC Acquisition invoices for $8.5 million in services allegedly performed by Mr. Siffin during the first half of 2019 are a sham.  They do not correlate to any work actually performed by Mr. Siffin, or anyone else acting on behalf of MDC Acquisition, and it is clear that the payments were intended merely to benefit Mr. Siffin and his other entities in the months leading up to the bankruptcy filing of the companies he stole the millions from. Maefield aided and abetted these fraudulent transfers by approving the invoices and subsequent payments to Mr. Siffin through its CFO, Mr. Quinn. MDC Acquisition aided and abetted the fraudulent transactions by being the conduit through which the stolen funds were received and later transferred,

### G.    Mr. Siffin's Oil and Gas Empire Crumbles

89.    On October 22, 2019, with the financial walls crashing around him, Mr. Siffin caused MTE to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The following day, Mr. Siffin caused Olam Resources I LLC and MTE Partners LLC to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  Finally on November 8, 2019, Mr. Siffin caused the

remainder of his oil and gas related entities, including MDC, to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

90.     Simply stated, the bankruptcy proceedings were highly contentious at virtually every turn with Mr. Siffin doing everything within his power to maintain control over his oil and gas business.  However, that is not what happened.  Instead, a bankruptcy plan was confirmed that provided for the preservation of the claims asserted herein and resulted in the creation of the MTE Litigation Trust and the ouster of Mr. Siffin from both MTE and MDC.

## V.  CAUSES OF ACTION

### Count One

### Fraud (Against Mr. Siffin,  Mr. Quinn and Mr. Cyphers)

91.     To the extent not inconsistent herewith, the MTE Litigation Trust incorporates by reference the allegations made in paragraphs 1 through 90 as if set forth fully herein.

92.     Mr. Siffin,  Mr. Quinn and Mr. Cyphers made, or caused to be made, materially false representations to the Lenders relating to the financial condition and operation of MTE and MDC.

93.     The false information constituted material facts about MDC's and MTE's financial condition and operations at the time that information was submitted to the Lenders.

94.     The false representations were made intentionally and knowingly by Mr. Siffin,  Mr. Quinn and Mr. Cyphers and they knew that the information submitted to the Lenders was false at the time it was submitted to the Lenders.  Alternatively, Mr. Siffin,  Mr. Quinn  and Mr. Cyphers made these representations recklessly as positive assertions without any knowledge of their truth.  Mr. Siffin,  Mr. Quinn and Mr. Cyphers submitted the information to the Lenders with the intention that the Lenders rely on it in making determinations as to make further draws in connection with the Credit Agreement.

95.     The Lenders did in fact reasonably rely on the false information provided by Mr. Siffin, Mr. Quinn and Mr. Cyphers in agreeing to allow additional draws to be made under the Credit Agreement.

96.     The Lenders were justified to rely on the representations and the false information provided by Mr. Siffin, Mr. Quinn and Mr. Cyphers.

97.     But for the false information provided by Mr. Siffin, Mr. Quinn and Mr. Cyphers and the Lenders reliance thereon, the Lenders would not have allowed additional draws to be made in connection with the credit agreement.

98.     The Lenders, and now the MTE Litigation Trust by virtue of the assignments, have been damaged by Mr. Siffin's, Mr. Quinn's and Mr. Cyphers's fraudulent conduct in an amount to be determined at trial but believed to be at least $120,000,000.

## Count Two

## Breach of Fiduciary Duty (Against Mr. Siffin, Mr. Quinn and Mr. Cyphers)

99.     To the extent not inconsistent herewith, the MTE Litigation Trust incorporates by reference the allegations made in paragraphs 1 through 98 as if set forth fully herein.

100.    Mr. Siffin was the Chief Executive Officer of MDC; Mr. Quinn was the CFO; and Mr. Cyphers was the COO. As such they each owed fiduciary duties to MDC. Moreover, Mr. Siffin, Mr. Quinn and Mr. Cyphers were officers of MTE and owed fiduciary duties to MTE as well. Fiduciary duty encompasses the duty of care and loyalty.

101.    With respect to the duty of care, Mr. Siffin, Mr. Quinn and Mr. Cypjers were required to inform themselves, prior to making decisions, of all material facts reasonably available to them. In this regard their conduct cannot amount to indifference amounting to recklessness.

102.    With respect to the duty of loyalty, Mr. Siffin, Mr. Quinn and Mr. Cyphers were required to put the best interests of MDC and its shareholder (now the MTE Trust) ahead of any

interest of their own or others.  Mr. Siffin,  Mr. Quinn and Mr. Cyphers also owed the duty of candor and disclosure owed a duty of good faith, which entails not acting with another purpose than that of MTE and MDC's interest, not violate applicable law and not act in conscious disregard of those duties.

103.    Mr. Siffin breached the fiduciary duties of care and loyalty when he absconded with $8.5 million as described more particularly in paragraphs 76 through 88 above.  The breaches of fiduciary duty by Mr. Siffin as described herein were done intentionally and were not the result of mere inadvertence or an indifference amounting to recklessness (gross negligence).  Rather, Mr. Siffin intentionally stole funds from MDC in breach of his fiduciary duties of care and loyalty.

104.    Mr. Quinn and Mr. Cyphers breached the fiduciary duties of care and loyalty when they assisted Mr. Siffin in absconding with $8.5 million as described more particularly in paragraphs 76 through 88 above.  The breaches of fiduciary duty by Mr. Quinn and Mr. Cyphers as described herein were done intentionally and were not the result of mere inadvertence or an indifference amounting to recklessness (gross negligence).  Rather, Mr. Quinn and Mr. Cyphers intentionally assisted Mr. Siffin's theft of funds from MDC in breach of their fiduciary duties of care and loyalty.

105.    By virtue of the Plan, the MTE Litigation Trust is now the sole member of MDC.  The purpose of making the MTE Litigation Trust the sole member of MDC was to grant it  standing to pursue these breach of fiduciary duty claims because its status as a member devolved by operation of law from an entity that was a member of MDC at the time of the events complained of herein occurred.  Mr. Siffin's,  Mr. Quinn's and Mr. Cyphers's breaches of fiduciary duty caused damages in an amount to be determined at trial but believed to be at least $8,500,000.

## Count Three

## Aiding and Abetting Breach of Fiduciary Duty (Against Mr. Quinn, Mr. Cyphers, Maefield and MDC) Acquisition)

106.    To the extent not inconsistent herewith, the MTE Litigation Trust incorporates by reference the allegations made in paragraphs 1 through 105 as if set forth fully herein.

107.    Mr. Siffin was the Chief Executive Officer of MDC.  As such he owed fiduciary duties to MDC. Likewise, as an officer of MTE, he also owed fiduciary duties to it.  Fiduciary duty encompasses the duty of care and loyalty.

108.    With respect to the duty of care, Mr. Siffin was required to inform himself, prior to making decisions, of all material facts reasonably available to him.  In this regard his conduct cannot amount to indifference amounting to recklessness.

109.    With respect to the duty of loyalty, Mr. Siffin was required to put the best interests of MDC and its shareholder (now the MTE Trust) ahead of any interest of his own.  Mr. Siffin also owed the duty of candor and disclosure.  Mr. Siffin also owed a duty of good faith, which entails not acting with another purpose than that of MTE and MDC's interest, not violate applicable law and not act in conscious disregard of those duties.

110.    Mr. Siffin breached the fiduciary duties of care and loyalty when he absconded with $8.5 million as described more particularly in paragraphs 76 through 88 above.  The breaches of fiduciary duty by Mr. Siffin as described herein were done intentionally and were not the result of mere inadvertence or an indifference amounting to recklessness (gross negligence).  Rather, Mr. Siffin intentionally stole funds from MDC in breach of his fiduciary duties of care and loyalty.

111.    Mr. Quinn, Mr. Cyphers, Maefield and MDC Acquisition knowingly participated in Mr. Siffin's breaches of fiduciary duties. Maefield,  Mr. Quinn and Mr. Cyphers approved the fraudulent payments to Mr. Siffin and MDC Acquisition functioned as the conduit through which the

payments were received by Mr. Siffin and subsequently transferred.  Maefield was also a knowing recipient of the stolen funds.

112.     By virtue of the Plan, the MTE Litigation Trust is now the sole member of MDC.  The purpose of making the MTE Litigation Trust the sole member of MDC was to grant it  standing to pursue these aiding and abetting breach of fiduciary duty claims because its status as a member devolved by operation of law from an entity that was a member of MDC at the time of the events complained of herein occurred.  The concerted action of Mr. Siffin, Mr. Quinn, Mr. Cyphers, Maefield and MDC Acquisition caused damage in an amount to be determined at trial but believed to be at least $8,500,000.

### Count Four

### Unjust Enrichment (Against MDC Acquisition, Maefield and MDCE)

113.     To the extent not inconsistent herewith, the MTE Litigation Trust incorporates by reference the allegations made in paragraphs 1 through 112 as if set forth fully herein.

114.     MDC Acquisition, Maefield and MDCE each received either directly or for its benefit portions of the $8.5 million stolen by Mr. Siffin.  MDC Acquisition, Maefield and MDCE wrongfully secured these benefits or passively received these benefits, and it would be unconscionable for them to retain such benefits.  Because they received these benefits unjustly, they should be required to make restitution for these benefits.

115.     By virtue of the Plan, the MTE Litigation Trust is now the sole member of MDC.  The purpose of making the MTE Litigation Trust the sole member of MDC was to grant it  standing to pursue these unjust enrichment claims because its status as a member devolved by operation of law from an entity that was a member of MDC at the time of the events complained of herein occurred.

## Count Five

### Corporate Waste (Against Mr. Siffin,  Mr. Quinn and Mr. Cyphers)

116.    To the extent not inconsistent herewith, the MTE Litigation Trust incorporates by reference the allegations made in paragraphs 1 through 115 as if set forth fully herein.

117.    The $8.5 million stolen by Mr. Siffin, with Mr. Quinn's and Mr. Cyphers's knowing participation, also constitutes corporate waste.  The transactions were done on terms that no reasonable person of ordinary, sound business judgment could conclude represent a fair exchange. Indeed, no such person could even entertain the view that the transactions represented a fair exchange.

118.    By virtue of the Bankruptcy Plan, the MTE Litigation Trust is now the sole member of MDC.  The purpose of making the MTE Litigation Trust the sole member of MDC was to grant it standing to pursue these corporate waste claims because its status as a member devolved by operation of law from an entity that was a member of MDC at the time of the events complained of herein occurred.  Mr. Siffin's corporate waste has caused damage in an amount to be determined at trial but believed to be at least $8,500,000.

## VI.  JURY DEMAND

119.    The MTE Litigation Trust demands that this matter be tried before a jury.

## VII.  PRAYER FOR RELIEF

**WHEREFORE,** MTE Litigation Trust requests that this Court enter judgment in its favor as follows:

1.    Judgment against Mr. Siffin,  Mr. Quinn and Mr. Cyphers jointly and severally with each other for at least $120,000,000 on Count One;

2.    Judgment against Mr. Siffin,  Mr. Quinn and Mr. Cyphers jointly and severally with each other for at least $8,500,000 on Count Two and Count Five;

3.    Judgment against Mr. Quinn, Mr. Cyphers, Maefield and MDC Acquisition jointly

and severally with each other and with Mr. Siffin for at least $8,500,000 on Count Three;

4.      Judgment against Maefield, MDC Acquisition and MDCE on Count Four in an amount to be proven at trial;

5.      Punitive damages against all Defendants in an amount determined at trial:

6.      Prejudgment and post judgment interest as allowed by law;

7.      For costs of suit against all Defendants;

8.      For attorneys' fees, costs of investigation and litigation against all Defendants; and

9.      For such other and further relief as this Court deems just and proper.

Respectfully submitted this 16th day of November, 2021.

BAILEY GLASSER LLP


*/s/ John G. Turner III*
Brian A. Glasser (*pro hac vice forthcoming*)
John G. Turner III (TX # 203020550)
Robert R. Bell III (TX# 00787062)
1055 Thomas Jefferson Street NW
Suite 540
Washington, DC 20007
Telephone: (202) 463-2101
Facsimile: (202) 463-2103
E-mail:    bglasser@baileyglasser.com
             jturner@baileyglasser.com
             rbell@baileyglasser.com

*Attorneys for Plaintiff*